UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| KISSIMMEE UTILITY AUTHORITY EMPLOYEES' RETIREMENT PLAN, on Behalf of Itself and All Others Similarly Situated,<br><br>       Plaintiff,<br><br> vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., JASON R. WHITAKER, JEFFERY TOLNAR, BRANDON MOSS, PHILIP GARTON, KEVIN HUBBARD, DOMINIC BARDOS, BRAD FORTH, PETER WILVER, TY DAUL, TONI VOLPE, LORI SUNDBERG, JEANETTE MILLS, ROBERT JULIAN, DEAN SOLON, J.P. MORGAN SECURITIES LLC, GUGGENHEIM SECURITIES, LLC, MORGAN STANLEY & CO. LLC, UBS SECURITIES LLC, GOLDMAN SACHS & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, COWEN AND COMPANY, LLC, OPPENHEIMER & CO. INC., PIPER SANDLER & CO., ROTH CAPITAL PARTNERS, LLC,  JOHNSON RICE & COMPANY L.L.C., and NORTHLAND SECURITIES, INC.,<br><br>      Defendants. | Civil Action No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

_____  DEMAND FOR JURY TRIAL

Plaintiff Kissimmee Utility Authority Employees' Retirement Plan ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and

plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings by Shoals Technologies Group, Inc. ("Shoals" or the "Company"), Company press releases and earning calls, court filings in related litigation, and analyst and media reports about the Company.[1] Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Shoals Class A common stock between January 27, 2021 and May 7, 2024 inclusive (the "Class Period"), including purchases directly in Shoals' December 2022 secondary public offering of Class A common stock (the "SPO"). Plaintiff seeks to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"), against Shoals, certain of the Company's senior officers and directors, and the underwriters for the SPO.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, and §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, §27 of the 1934 Act, 15 U.S.C. §78aa, and §22 of the 1933 Act, 15 U.S.C. §77v.

4. Venue is proper in this District pursuant to §27 of the 1934 Act, §22 of the 1933 Act, and 28 U.S.C. §1391(b) because the Company resides and is headquartered in this District, and the

---

[1] Emphasis has been added throughout unless otherwise noted.

events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

5.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Kissimmee Utility Authority Employees' Retirement Plan, as set forth in the accompanying certification incorporated by reference herein, purchased Shoals Class A common stock during the Class Period, including directly in the SPO, and has been damaged thereby.

7.     Defendant Shoals is a provider of electrical balance of systems ("EBOS") solutions used in solar, storage, and electrical vehicle charging infrastructure.  The Company is headquartered in Portland, Tennessee.  Shoals Class A common stock is listed on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "SHLS."

8.     Defendant Jason R. Whitaker ("Whitaker") served as Shoals' Chief Executive Officer ("CEO") from January 2020 until March 2023, and held the position of President from December 2017 to December 2022.  Defendant Whitaker also served as a member of Shoals' Board of Directors ("Board") from January 2021 until March 2023.

9.     Defendant Jeffery Tolnar ("Tolnar") served as Shoals' Interim CEO from March 2023 until July 2023, and has served as the Company's President since December 2022.

10.    Defendant Brandon Moss ("Moss") has served as Shoals' CEO since July 2023.

11.    Defendant Philip Garton ("Garton") served as Shoals' Chief Financial Officer ("CFO") from December 2017 until his departure from the Company in May 2022.

12.     Defendant Kevin Hubbard ("Hubbard") served as Shoals' Interim CFO from May 2022 until October 2022.  Prior to his role as Interim CFO, Hubbard served as Shoals' outside financial reporting consultant.

13.     Defendant Dominic Bardos ("Bardos") has served as Shoals' CFO since October 2022.

14.     Defendants referenced above in ¶¶8-13 are referred to herein as the "1934 Act Individual Defendants."  Each of the 1934 Act Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, products, and present and future business prospects during the time of their employment with the Company.  In addition, the 1934 Act Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

15.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the 1934 Act Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, products, and present and future business prospects during the time of their employment with the Company.  In addition, the 1934 Act Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and

complete information. These defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16. The 1934 Act Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each 1934 Act Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each 1934 Act Individual Defendant is responsible for the accuracy of the public statements as detailed herein and is, therefore, primarily liable for the representations contained therein.

17. The 1934 Act Individual Defendants together with Shoals are referred to herein as the "1934 Act Defendants."

18. Defendant Brad Forth ("Forth") served as Chairman of the Company at the time of the SPO.

19. Defendant Peter Wilver ("Wilver") served as a director of the Company at the time of the SPO.

20. Defendant Ty Daul ("Daul") served as a director of the Company at the time of the SPO.

21. Defendant Toni Volpe ("Volpe") served as a director of the Company at the time of the SPO.

22. Defendant Lori Sundberg ("Sundberg") served as a director of the Company at the time of the SPO.

23.     Defendant Jeanette Mills ("Mills") served as a director of the Company at the time of the SPO.

24.     Defendant Robert Julian ("Julian") served as a director of the Company at the time of the SPO.

25.     Defendant Dean Solon ("Solon") founded Shoals in 1996 and served as the Company's CEO and President from November 1996 until December 2019. Thereafter, defendant Solon served as a director of the Company until February 2022. Defendant Solon was a controlling shareholder of the Company during the Class Period and held approximately 40% of the voting power of Shoals stock at the time of the Company's initial public offering (the "IPO"). As stated in its IPO offering documents, Shoals was "currently controlled, and after this offering is completed will continue to be controlled, by Oaktree and the Continuing Equity Owners," which included defendant Solon. Defendant Solon, together with other Shoals executives and major Shoals shareholders, caused the Company to enter into various transactions and agreements prior to the IPO to increase his power and control over the Company and its affairs out of proportion with his share ownership and to provide him with certain preferential financial benefits. These transactions and agreements included, *inter alia*, a registration rights agreement, a stockholders agreement, and a tax receivable agreement. Prior to the SPO, defendant Solon owned nearly 34% of the combined voting power of Shoals stock. Defendant Solon sold 27.9 million shares of Shoals stock in the SPO for more than $620 million in gross offering proceeds.

26.     The defendants referenced in ¶¶18-25 above, together with defendants Whitaker and Bardos, are collectively referred to herein as the "1933 Act Individual Defendants." Each of the 1933 Act Individual Defendants other than defendant Solon signed the registration statement for the

SPO and solicited investors for the SPO and otherwise participated in the SPO for their own financial benefit and/or the financial benefit of Shoals and defendant Solon.

27.     Defendants J.P. Morgan Securities LLC, Guggenheim Securities, LLC, Morgan Stanley & Co. LLC, UBS Securities LLC, Goldman Sachs & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Cowen and Company, LLC, Oppenheimer & Co. Inc., Piper Sandler & Co., Roth Capital Partners, LLC, Johnson Rice & Company L.L.C., and Northland Securities, Inc. are referred to herein as the "Underwriter Defendants." The Underwriter Defendants are all investment banking houses with operations in the United States. The Underwriter Defendants served as underwriters for the SPO. The Underwriter Defendants purported to conduct a due diligence investigation in connection with the SPO and gained access to information regarding the Company, its business, operations, financial results, and prospects. The Underwriter Defendants solicited investors for the SPO and otherwise participated in the SPO for their own financial benefit, sharing over $23 million in underwriting discounts and commissions for the SPO, which included a full exercise of the underwriters' overallotment option.

## BACKGROUND

28.     Founded in 1996, Shoals is a provider of EBOS solutions and components for solar, battery storage, and electrical vehicle charging applications. Shoals' EBOS provides components necessary for the transfer of electrical power produced by solar panels to intermediate locations within a solar project and ultimately to the power grid. Shoals employs a proprietary EBOS system, which it dubs a "combine-as-you-go" solution, which the Company claims offers several advantages over conventional EBOS systems using "homerun" wiring architecture. In contrast to conventional EBOS systems, Shoals' combine-as-you-go solution uses specialized wire harnesses to connect multiple strings of solar panels to Shoals' proprietary above-ground feeder cable known as a "Big Lead Assembly" ("BLA"). The BLA is Shoals' core combine-as-you-go product.

29.     Shoals claims that its proprietary wire system requires less wires and wire connections than other offerings and eliminates altogether the need for other materials utilized in homerun wiring architecture, which the Company states results in lower labor and material costs.  Of particular importance to investors, Shoals purports that its proprietary solutions have greater reliability and lower maintenance costs than conventional EBOS systems.

30.     Shoals offers its customers an assurance type warranty that protects against manufacturer defects.  The Company accounts for warranty liabilities by recording a reserve provision for estimated future costs related to warranty remediation expenses.  Since Shoals' IPO in January 2021 until the revelations detailed herein, the Company recorded only modest amounts in warranty-related reserves.  For example, for fiscal years ending December 31, 2021 and 2022 Shoals' estimated accrued warranty reserve was $100,000 and $600,000, respectively.

31.     Shoals generates the majority of its revenue from the sale of "system solutions," which are complete EBOS systems that employ several of the Company's EBOS components.  Shoals also generates revenue from the sale of individual EBOS components, as well as other components used for battery storage and EV charging applications.  In fiscal year 2022, Shoals derived approximately 88% and 22% of its revenue from the sale of system solutions and from the sale of components, respectively.  During the Class Period, Shoals' combine-as-you-go system solutions carried higher margins than its other products and was therefore the most profitable source of revenue for the Company.

32.     Shoals provides investors with measures of client demand and anticipated future business through two operational metrics: (i) backlog; and (ii) awarded orders.  The Company defines "backlog" as "signed purchase orders or contractual minimum purchase commitments with take-or-pay provisions."  "Awarded orders" is defined as orders that Shoals is in the "process of

documenting a contract but for which a contract has not been signed." Shoals often reports its backlog and awarded orders through a single monetary figure representing the total sum of future expected revenue. Accordingly, Shoals' backlog and awarded orders are each important forward indicators of the Company's future financial, operational, and business performance.

33. Throughout the Class Period, defendants emphasized the purported "quality," "reliability," and "safety" of Shoals' EBOS products and claimed these purported advantages were critical to the Company's ability to generate business. For example, speaking during an August 2022 conference call, defendant Whitaker emphasized the "performance, quality, reliability, [and] installation savings" of Shoals' offerings and represented that these benefits served as a launch pad for the Company's "long-term" relationships with its clients, stating in pertinent part as follows:

> Components revenue increased 97% year-over-year, driven by increases in shipments of battery storage products as well as shipments of solar products to a significant number of new customers. New customers projects are typically designed to timeline systems and they generally start the relationship with Shoals by buying components that will work with these types of systems.
>
> ***Re-fixing the performance, quality, reliability, installation savings and customer service that Shoals offers***, they become open to trying our combine-as-you-go architecture and buy the BLA. ***Once customers make the transition, this usually marks the start of a long-term relationship***.

34. Defendants' filings with the SEC likewise highlighted the "several advantages" that Shoals' products purportedly enjoyed over conventional EBOS systems with claims that Shoals' combine-as-you-go system had "greater reliability," "lower maintenance costs," and "lower[] material and shipping costs" as compared to competing products.

35. Due in substantial part to the "value proposition" that Shoals' products purported to offer, defendants claimed throughout the Class Period that demand for Shoals' products was "robust" and "continue[d] to grow," and highlighted the Company's "record" breaking revenue and earnings. For example, in connection with Shoals' fourth quarter 2022 earnings announcement, the

Company boasted that it had "'set new records for revenue, gross profit, net income, adjusted EBITDA and adjusted net income'" for both the fourth quarter and full year 2022. Further emphasizing Shoals' performance, defendant Whitaker represented that Shoals was "'commercially, operationally and financially'" the strongest "'it ha[d] ever been.'"

36.     Unbeknownst to investors, however, during the Class Period Shoals was suffering from a massive, undisclosed warranty problem that impacted approximately 30% of wire harnesses Shoals had manufactured during the 2020 through 2022 time period. Beginning several months prior to the start of the Class Period, Shoals had utilized defective specialty wires manufactured by a third party in a substantial portion of its wire harnesses, resulting in excessive "shrinkback" whereby insulating material surrounding wires at connection points improperly contracted, leaving live wires exposed and creating serious risks of fire, injury, or death to Shoals' customers. As a result, Shoals was liable for millions of dollars in undisclosed warranty remediation costs, which the Company has ultimately estimated could cost as much as $185 million. The widespread use of defective wires in its projects has also significantly damaged Shoals' reputational standing among its customers. As a result, Shoals' ability to competitively differentiate its offerings has been materially impaired, exposing the Company's business, finances, and operations to significant disruption and reputational harm, as well as the material undisclosed risks of lost sales, increased costs, and other negative consequences.

37.     In May 2023 – approximately three years after the Company began utilizing defective and potentially dangerous wiring in its harness installations – Shoals first mentioned the shrinkback issue in a Form 10-Q quarterly report for its first fiscal quarter ended March 31, 2023. The report materially misrepresented the scope of the issue, stating the Company only had $400,000 in accrued warranty liability at quarter end, a $200,000 decrease from the prior quarter. The quarterly report

also misleadingly downplayed the harm to the Company by describing the shrinkback issue as impacting only "a subset of specific colored wire provided by one specific supplier."

38.     Then, on August 1, 2023, in connection with reporting its second fiscal quarter 2023 results, Shoals revealed that it was recording a $9.4 million warranty expense to reflect costs primarily related to shrinkback remediation, offsetting other claimed improvements in the Company's margin profile and causing its gross margins to decline sequentially to 42.4% from 45.9% in the prior quarter.  During the corresponding conference call, defendant Bardos sought to assuage investor concerns regarding the Company's warranty expense exposure, falsely stating that the warranty expense incurred within the quarter was "adequate to do the remediation required."

39.     Contrary to this representation, Shoals would go on to announce an additional $50 million in shrinkback warranty expenses the following quarter, representing a more than five-fold increase.  Shoals would likewise disclose that 30% of its wire harnesses manufactured from 2020 to 2022 had been impacted by the shrinkback issue and that ultimate remediation costs could reach as high as $185 million.

40.     As would subsequently be revealed, the installation of defective – and potentially dangerous – wire harnesses on so many of the Company's projects has also negatively impacted Shoals' customer relationships.  For example, a November 10, 2023 Roth MKM analyst report stated their "checks" with Shoals' customers

> suggest that since receiving the safety notice from SHLS regarding shrinkback . . . , customers are likely scrambling to identify any instances of the issue.  ***Critical concerns we have heard include (1) Serious injury or death, (2) The exposed wiring may cause fire and property damage, and (3) PUCs may get involved with increased scrutiny***.

(Emphasis in original.)  Moreover, at least one affected site has already reported property damage arising from a brush fire believed to have ignited as a result of contact with a defective, Shoals-installed wire harness.

41.     In subsequent quarters, Shoals has revealed dramatically deteriorating results, reflecting in part the effects of the shrinkback issue on the Company's customer relationships, and the materialization of the risks concealed by defendants' materially misleading misstatements and omissions as detailed herein.  In reporting its fourth fiscal quarter of 2023 results, Shoals revealed a sequential quarterly decline of $2 million in the Company's backlog and awarded orders.  The Company also issued disappointing revenue guidance for fiscal year 2024 of $480 million to $520 million that was approximately 19% below consensus estimates at the midpoint.  Shoals' business further deteriorated in its first fiscal quarter of 2024, with backlog and awarded orders falling sequentially by over $16 million and the Company reducing its already disappointing guidance to a range of $440 million to $490 million due in part to an "unprecedented" customer cancellation and project delays.  In a Form 10-Q quarterly report the Company filed with the SEC, Shoals has also disclosed that the Company "may increase" its estimated warranty liability a "material" amount.

42.     As a result of these disclosures, the price of Shoals Class A common stock has declined from a Class Period high of over $40 per share to less than $8 per share by the end of the Class Period, causing plaintiff and the Class (defined below) to suffer hundreds of millions of dollars in losses and economic damages under the federal securities laws.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

43.     The Class Period begins on January 27, 2021, the day after the Company's registration statement for its IPO was declared effective by the SEC.  On December 30, 2020, Shoals filed with the SEC a registration statement on Form S-1 for the IPO (the "IPO Registration Statement").  On January 28, 2021, Shoals filed with the SEC a prospectus on Form 424B4 for the IPO (the "IPO Prospectus"), which incorporated and formed part of the IPO Registration Statement. In the IPO, Shoals and one of the Company's private equity owners, an affiliate of Oaktree Capital

Management, L.P., collectively sold more than 88.5 million shares of Shoals Class A common stock, which included a full exercise of the underwriters' overallotment option, at $25 per share for over $2.2 billion in gross offering proceeds.

44.     The IPO Registration Statement highlighted the purported "reliability and safety" of Shoals' products, stating that the Company was "founded" to provide EBOS solutions that "improve reliability and safety" and that its solutions were "more reliable" than "any other" solar EBOS system that was commercially available.  The IPO Registration Statement further represented that Shoals' combine-as-you-go solution had "greater reliability and lower maintenance costs" than competing products and claimed that its "reliability advantages" had contributed to the adoption of its products in the marketplace.  The IPO Registration Statement also stated that Shoals "prioritize[d]" developing products that improved the "reliability and safety" of renewable energy, which it claimed had contributed to Shoals' "[l]ongstanding reputation for differentiated products" within the industry.

45.     The IPO Registration Statement stated that for its fiscal year ended December 31, 2020: (i) Shoals' preliminary unaudited annual revenue had increased 21% to an estimated range of $174 million to $176 million at the midpoint, up from $145 million in the prior fiscal year; and (ii) the Company's annual net income had increased 32% to an estimated range of $32 million to $34.5 million at the midpoint, up from $25 million in the prior fiscal year.

46.     On March 15, 2021, Shoals issued a press release reporting the Company's financial results for its fourth fiscal quarter and year ended December 31, 2020 ("4Q20 Release").  The 4Q20 Release stated that Shoals' quarterly revenue had increased year-over-year to $39 million from $38 million in the prior year period.  The 4Q20 Release further stated that Shoals' quarterly gross profit

had increased 19% year-over-year to $15 million from $12.5 million in the prior year period. In addition, the 4Q20 Release stated that Shoals achieved quarterly net income of $4.2 million.

47.     On March 16, 2021, Shoals filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2020 ("FY20 Form 10-K"), which was signed by defendants Whitaker, Garton, and Solon, among others. The FY20 Form 10-K contained the same financial information regarding Shoals' revenue, gross profit, and net income that was reported in the 4Q20 Release.

48.     On May 3, 2021, Shoals issued a press release reporting the Company's financial results for its first fiscal quarter ended March 31, 2021 ("1Q21 Release"). The 1Q21 Release stated that Shoals' quarterly revenue had increased 12% year-over-year to a "record" $45.6 million up from $41 million in the prior year period. The 1Q21 Release also stated that the Company's quarterly gross profit had increased 32% year-over-year to $19 million, up from $14 million in the prior year period, and that its gross margin in the quarter had expanded by 635 basis points year-over-year to 41.2% from 34.8% in the prior year period. In addition, the 1Q21 Release stated that Shoals had recorded a quarterly net loss of $8.3 million. The 1Q21 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved "system performance, reliability and safety."

49.     On May 4, 2021, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2021 ("1Q21 Form 10-Q"), which was signed by defendants Whitaker and Garton. The 1Q21 Form 10-Q contained the same financial information regarding Shoals' revenue, gross profit, and net income that was reported in the 1Q21 Release.

50.     On August 10, 2021, Shoals issued a press release reporting the Company's financial results for its second fiscal quarter ended June 30, 2021 ("2Q21 Release"). The 2Q21 Release stated

that Shoals' quarterly revenue had grown 38% year-over-year to $60 million from $43.4 million in the prior year period. The 2Q21 Release further stated that Shoals' quarterly gross profit had increased 56% year-over-year to $26 million from $17 million in the prior year period. The 2Q21 Release also stated that Shoals' quarterly net income had increased to $9 million up from $5 million in the prior year period. The 2Q21 Release quoted defendant Whitaker who emphasized Shoals' combine-as-you-go solution, claiming that demand for the Company's product "'continue[d] to . . . grow[].'" In addition, the 2Q21 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved "system performance, reliability and safety."

51.     On August 11, 2021, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2021 ("2Q21 Form 10-Q"), which was signed by defendants Whitaker and Garton. The 2Q21 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in the 2Q21 Release.

52.     On November 9, 2021, Shoals issued a press release reporting the Company's financial results for its third fiscal quarter ended September 30, 2021 ("3Q21 Release"). The 3Q21 Release stated that Shoals' quarterly revenue had increased 14% year-over-year to $60 million from $53 million in the prior year period. The 3Q21 Release further stated that Shoals' quarterly gross profit had increased 5% to $22 million from $21 million in the prior year period. In addition, the 3Q21 Release stated that Shoals had achieved quarterly net income of $5 million. The 3Q21 Release quoted defendant Whitaker who represented that Shoals was growing "'faster than the market'" and taking "'share'" from conventional EBOS providers. In addition, the 3Q21 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved "system performance, reliability and safety."

53.     On November 10, 2021, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2021 ("3Q21 Form 10-Q"), which was signed by defendants Whitaker and Garton.  The 3Q21 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in the 3Q21 Release.

54.     On March 10, 2022, Shoals issued a press release reporting the Company's financial results for its fourth fiscal quarter and year ended December 31, 2021 ("4Q21 Release").  The 4Q21 Release stated that Shoals' quarterly revenue had increased 24% year-over-year to $48 million from $39 million in the prior year period.  The 4Q21 Release further stated that Shoals' quarterly gross profit had increased 7% year-over-year to $16 million up from $15 million in the prior year period.  The 4Q21 Release also stated that Shoals had recorded a quarterly net loss of $2.2 million.  In addition, the 4Q21 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved "system performance, reliability and safety."

55.     On March 11, 2022, Shoals filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2021 ("FY21 Form 10-K"), which was signed by defendants Whitaker and Garton, among others.  The FY21 Form 10-K contained the same financial information regarding Shoals' revenue, gross profit, and net income that was reported in the 4Q21 Release.

56.     On May 16, 2022, Shoals issued a press release reporting the Company's financial results for its first fiscal quarter ended March 31, 2022 ("1Q22 Release").  The 1Q22 Release stated that Shoals' quarterly revenue had increased 49% year-over-year to a "record" $68 million up from $45.6 million in the prior year period.  The 1Q22 Release also stated that the Company's quarterly gross profit had increased 40% year-over-year to $26 million, up from $19 million in the prior year

period, and that its gross margin in the quarter had "expanded" more than 550 basis points to 38.7% on a sequential basis. The 1Q22 Release further stated that Shoals' quarterly net income had improved year-over-year to $5 million from a net loss of $8 million. The 1Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved "system performance, safety, and reliability."

57. Also on May 16, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the first quarter of 2022 hosted by defendants Whitaker and Hubbard. During the call, defendant Whitaker emphasized the purported "reliability" and "quality" of Shoals' products and claimed they were generating "a lot of opportunities" for the Company, stating in pertinent part as follows:

> And also, when you look at the case – the use case in the international market, obviously, the higher the labor, the higher the value proposition. But the reality is, even outside of that, there's a lot of opportunities. We're seeing places that have very low – or relatively low labor rates that we're seeing success with as well. **So there's more than just the labor aspect when you look at the quality and the reliability of our product offerings out there**.

58. On May 17, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022 ("1Q22 Form 10-Q"), which was signed by defendants Whitaker and Hubbard. The 1Q22 Form 10-Q contained the same financial information regarding Shoals' revenue, gross profit, and net income that was reported in the 1Q22 Release.

59. On August 15, 2022, Shoals issued a press release reporting the Company's financial results for its second fiscal quarter ended June 30, 2022 ("2Q22 Release"). The 2Q22 Release stated that Shoals' quarterly revenue had grown 23% year-over-year to $73.5 million from $60 million in the prior year period. The 2Q22 Release further stated that Shoals' quarterly gross profit had increased 9% year-over-year to $29 million from $26 million in the prior year period and that it had achieved $7.3 million in quarterly net income. The 2Q22 Release quoted defendant Whitaker who

emphasized Shoals' combine-as-you-go solution, claiming that demand for the Company's product "'continue[d] to grow.'"  In addition, the 2Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

60.     Also on August 15, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the second quarter of 2022, hosted by defendants Whitaker and Hubbard.  During his prepared remarks, defendant Whitaker highlighted the "performance, quality, reliability, [and] installation savings" of Shoals' products and claimed these benefits were the basis of the Company's "long-term relationship[s]" with its clients, stating in pertinent part as follows:

> Re-fixing *the performance, quality, reliability, installation savings and customer service that Shoals offers, they become open to trying our combine-as-you-go architecture and buy the BLA.  Once customers make the transition, this usually marks the start of a long-term relationship*.

61.     In response to a question from an analyst, defendant Whitaker emphasized the purported "value" of Shoals' products, including specifically their "quality" and "reliability," stating: "BLA can reduce labor costs, improve safety, increase reliability and reduce maintenance expenses."

62.     On August 16, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2022 ("2Q22 Form 10-Q"), which was signed by defendants Whitaker and Hubbard.  The 2Q22 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in the 2Q22 Release.

63.     On November 14, 2022, Shoals issued a press release disclosing the Company's financial results for its third fiscal quarter ended September 30, 2022 ("3Q22 Release").  The 3Q22 Release stated that Shoals' quarterly revenue had increased 52% year-over-year to $91 million from

$60 million in the prior year period. The 3Q22 Release further stated that Shoals' "record" quarterly gross profit had increased 66% to $36 million from $22 million in the prior year period due primarily to a higher proportion of revenue earned from Shoals' combine-as-you-go system, which the 3Q22 Release represented carried "higher margins" relative to the Company's other products. In addition, the 3Q22 Release stated that Shoals' quarterly net income had improved year-over-year to $13 million from $5 million in the prior year period. The 3Q22 Release also quoted defendant Whitaker who highlighted the purported "'performance'" of Shoals' products as enabling the Company to capitalize on improving market trends, stating in pertinent part as follows:

> "At the same time as we are taking share and introducing new products, conditions in our core solar market are improving. The two-year tariff exemption for Chinese solar panels, the recently passed Inflation Reduction Act and higher energy prices have given ***our customers and end-users the confidence to reinitiate previously delayed projects, make multi-year commitments to invest in solar generation and prioritize product availability and performance over price*** . . . ."

64.     In addition, the 3Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

65.     Also on November 14, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2022, hosted by defendants Whitaker and Bardos. During his prepared remarks, defendant Whitaker highlighted the purported "value proposition" offered by Shoals' combine-as-you-go system, which he claimed as enabling Shoals to capitalize on favorable market trends, stating in pertinent part as follows:

> In addition, the prevailing wage provision of the IRA is expected to compound wage pressure in the U.S. market, which further reinforces the value proposition of our combine-as-you-go system. From day 1, we set out to create products that can be installed by anyone as a response to the disproportionately high cost of installing EBOS, which can be equal to or in excess of the cost of the product itself. ***In environments where labor is more expensive, our solutions are especially***

*attractive as they take less time to install and are installable by general labor. We anticipate the prevailing wage provision will provide a significant tailwind for years to come.*

66.     That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2022 ("3Q22 Form 10-Q"), which was signed by defendants Whitaker and Bardos. The 3Q22 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in the 3Q22 Release.

67.     On November 30, 2022, Shoals filed with the SEC a registration statement for the SPO on Form S-3, which was also declared effective on that date (the "SPO Registration Statement"). On December 5, 2022, Shoals filed with the SEC a prospectus on Form 424B4, which incorporated and formed part of the SPO Registration Statement (the "SPO Prospectus"). In the SPO, Shoals and defendant Solon collectively sold 29.9 million shares of Shoals Class A common stock at $22.25 per share, which included a full exercise of the underwriters' overallotment option, for over $665 million in gross offering proceeds.

68.     The SPO Registration Statement highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved the "reliability and safety" of client projects. In addition, the SPO Registration Statement listed "converting customers" to Shoals' proprietary combine-as-you-go system as a "core" element of the Company's growth strategy. In particular, the SPO Registration Statement claimed that Shoals was "in the process of transitioning" an additional 14 customers to the Company's combine-as-you-go system, and that Shoals' was "currently prospecting" 72 other customers to make the same transition.

69.     The SPO Registration Statement also represented that for the nine months ended September 30, 2022: (i) Shoals' revenue had increased nearly 41% to $232 million, up from $165 million in the prior year period; (ii) the Company's gross profit had increased 36% to $91 million up

from $67 million in the prior year period; and (ii) its net income had increased more than 300% to $25 million up from $6 million in the prior year period. In addition, the SPO Registration Statement incorporated by reference the 3Q22 Form 10-Q and repeated the statements identified in ¶66.

70. On February 28, 2023, Shoals issued a press release reporting the Company's financial results for its fourth fiscal quarter and year ended December 31, 2022 ("4Q22 Release"). The 4Q22 Release stated that Shoals' quarterly revenue had increased 97% year-over-year to $95 million from $48 million in the prior year period. The 4Q22 Release further stated that Shoals' quarterly gross profit had increased 154% year-over-year to $40.4 million from $16 million in the prior year period. In addition, the 4Q22 Release stated that Shoals' quarterly net income had increased year-over-year to $118 million from $2 million in the prior year period.

71. The 4Q22 Release quoted defendant Whitaker who represented that Shoals was "commercially, operationally, and financially" the strongest "it ha[d] ever been," stating in pertinent part as follows:

> The strength of demand for our products is underscored by the $428.6 million of backlog and awarded orders that we ended the year with, which represented growth of 43% compared to the same time last year. As a matter of fact, in just the first few weeks of the new year, ***backlog and awarded orders has hit record levels yet again***, as we have continued to win new customers. I am incredibly proud of what Shoals has accomplished over the past several years and that ***I will leave the Company commercially, operationally and financially stronger than it has ever been***.

72. The 4Q22 Release highlighted the purported "safety" and "reliability" of Shoals products, representing that "since its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

73. That same day, Shoals filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2022 ("FY22 Form 10-K"), which was signed by defendants Whitaker and

Bardos, among others. The FY22 Form 10-K contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in 4Q22 Release. In addition, the FY22 Form 10-K stated that Shoals' provision for accrued warranty liability was $600,000 as of December 31, 2022. The FY22 Form 10-K further represented that Shoals' use of "interconnect harnesses" and BLA as part of its combine-as-you-go architecture resulted in "greater reliability" and "lower maintenance costs" as compared to conventional "homerun" systems, stating in pertinent part as follows:

> Connection points are often the source of failure in EBOS systems and must be inspected regularly. *A solar energy project that uses our interconnect harness and BLA will have significantly fewer connections and, as a result, fewer failure points to inspect* and maintain than the same project would using a conventional homerun system. *We believe fewer potential failure points contributes to higher reliability and lower maintenance costs for solar energy projects that use our combine-as-you-go system when compared to a conventional homerun system*.

74. On May 8, 2023, Shoals issued a press release reporting the Company's financial results for its first fiscal quarter ended March 31, 2023 ("1Q23 Release"). The 1Q23 Release stated that Shoals' quarterly revenue had increased 55% year-over-year to $105 million from $68 million in the prior year period. The 1Q23 Release further stated that Shoals' quarterly gross profit had increased 84% year-over-year to $48 million from $26 million in the prior year period. The 1Q23 Release also stated that Shoals' quarterly net income had increased 265% year-over-year to $17 million from $4.6 million in the prior year period. The 1Q23 Release quoted defendant Tolnar who emphasized Shoals' "'exceptional first quarter'" and "'record revenue and earnings'" and represented that the Company experienced "'continued robust demand'" for its products. The 1Q23 Release highlighted the purported "'safety'" and "'reliability'" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

75.     Also on May 8, 2023, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the first quarter of 2023, hosted by defendants Tolnar and Bardos.  During his prepared remarks, defendant Tolnar represented that Shoals "set a new record[] for revenue" in the quarter that was driven by "increased demand for Solar EBOS generally and [Shoals'] combine-as-you-go system solutions specifically."  Defendant Tolnar also stated that demand for Shoals' products "remained very strong" and that the Company observed an "acceleration" in quoting activity from prospective clients that broke "new records" in the quarter. Defendant Tolnar highlighted the purported "safety" and "reliability" of Shoals' products, claiming the Company had "invested millions of dollars" over the "last 27 years" to develop its EBOS solutions that "significantly increased installation efficiency and safety" and "improving system performance and reliability for the utility scale solar" market, among others.

76.     That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2023 ("1Q23 Form 10-Q"), which was signed by defendants Tolnar and Bardos.  The 1Q23 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in 1Q23 Release.  In addition, the 1Q23 Form 10-Q stated that Shoals' provision for accrued warranty liability was $400,000 as of March 31, 2023.

77.     In addition, the 1Q23 Form 10-Q listed as one of several "contingencies" facing the Company that Shoals had been "notified by certain customers" that "a subset of specific colored wire provided by one specific supplier" used in its EBOS systems were "presenting excessive pull back of wire insulation," and that, while it was "probable" the Company would incur costs related to the impacted wire harnesses, the Company could not "reasonably estimate those costs," stating in pertinent part as follows:

The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ("shrinkback"). ***Based upon the Company's initial assessment, the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier. While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs***. The Company is continuing its investigation of this matter to determine a course of action, and has substantially ceased use of the related wire from this supplier.

78. The statements referenced in ¶¶44-66 and 68-77 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a) that between 2020 and the end of 2022, Shoals had installed defective wires at approximately 300 sites impacting approximately 30% of all wire harnesses manufactured by the Company during this time period;

(b) that, as a result of (a) above, Shoals was facing tens of millions of dollars in shrinkback warranty liabilities;

(c) that Shoals had not booked a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue;

(d) that Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers;

(e) that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, and quality of its offerings had become materially impaired; and

(f)     that, as a result of (a)-(e) above, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects.

79.     In addition, Shoals' periodic SEC filings contained materially misleading discussions regarding the Company's warranty liabilities and potential product defects, misleadingly mentioning potential ***future*** contingent possibilities while failing to disclose adverse events that had ***already*** occurred.  For example, Shoals' periodic SEC filings stated that "defects" or "performance problems" in Shoals' products "***could*** result in loss of customers, reputational damage and decreased revenue, and we may face warranty, indemnity and product liability claims arising from defective products," but failed to disclose that the Company had been installing defective products since 2020 and that by at least March 2022 Shoals had ***already*** received customer complaints regarding specialty wires impacting 30% of the wire harnesses the Company had manufactured during the 2020 to 2022 time frame.

80.     Then, on August 1, 2023, Shoals issued a press release disclosing the Company's financial results for its second fiscal quarter ended June 30, 2023 ("2Q23 Release").  The 2Q23 Release and a related earnings call unexpectedly revealed that Shoals was recording a $9.4 million warranty expense primarily due to the shrinkback insulation issue.  As a result, the 2Q23 Release reported that Shoals' quarterly gross profit margin had declined sequentially to 42.4% from approximately 46% reported in the prior quarter.

81.     On this news, the price of Shoals Class A common stock fell from $26.11 per share on August 1, 2023 to $24.51 per share on August 2, 2023, or approximately 6%, on above-average trading volume of over 6 million shares traded.  However, the price of Shoals Class A common stock continued to be artificially inflated as defendants continued to make material misstatements and

omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

82.     The 2Q23 Release stated that Shoals' quarterly revenues had increased 62% year-over-year to $119 million from $73.5 million in the prior year period.  The 2Q23 Release further stated that Shoals' quarterly gross profit had increased 77% year-over-year to $50.5 million from $28.6 million in the prior year period.  The 2Q23 Release also stated that Shoals' quarterly net income had increased 159% year-over-year to $19 million from $7.3 million in the prior year period. The 2Q23 Release quoted defendant Tolnar who highlighted Shoals' purported "'outstanding performance'" and the "'records for revenue and earnings'" purportedly achieved during the quarter and claimed that demand for Shoals' products was "'robust'" and "'remained strong.'"

83.     On August 1, 2023, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the second quarter of 2023, hosted by defendants Moss, Bardos, and Tolnar.  During his prepared remarks, defendant Tolnar represented that Shoals' "record" financial performance in the quarter was driven by "increased demand for solar EBOS generally and [Shoals'] combine-as-you-go System Solutions specifically."  Defendant Tolnar further stated that demand for Shoals' products "remains very strong" and that the Company's system solutions experienced "continued share gains."

84.     During the call, an analyst from Oppenheimer & Co. Inc. inquired regarding the scope of the warranty expense issue, including the number of customers and shipments impacted, as well as how long these issues had occurred.  In response, defendant Bardos represented that the charge was "limited to one of [Shoals'] suppliers" and that the warranty expense incurred in the quarter was "***adequate to do the remediation required***."

85.     That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2023 ("2Q23 Form 10-Q"), which was signed by defendants Moss and Bardos.  The 2Q23 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in 2Q23 Release.  The 2Q23 Form 10-Q stated that Shoals' provision for accrued warranty expense was $9.4 million as of June 30, 2023.

86.     The statements referenced in ¶¶82-85 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a)     that between 2020 and the end of 2022, Shoals had installed defective wires at approximately 300 sites impacting approximately 30% of all wire harnesses manufactured by the Company during this time period;

(b)     that, as a result of (a) above, Shoals was facing tens of millions of dollars in shrinkback warranty liabilities;

(c)     that Shoals' $9.4 million provision for accrued warranty expense was insufficient to cover the remediation costs for the shrinkback issue;

(d)     that Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers;

(e)     that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, and quality of its offerings had become materially impaired; and

(f)     that, as a result of (a)-(e) above, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects.

87.     Then, on November 7, 2023, Shoals issued a press release disclosing the Company's financial results for its third fiscal quarter ended September 30, 2023 ("3Q23 Release").  Despite assurances from defendant Bardos that the $9.4 million warranty expense incurred in the second quarter was "adequate" to cover shrinkback remediation costs, the 3Q23 Release surprisingly revealed that Shoals' shrinkback warranty expenses had ballooned in the quarter to more than $50 million – representing a greater than five-fold increase.  As a result, the 3Q23 Release revealed that Shoals' quarterly gross profit had declined more than 60% to $14 million from $36 million in the prior year quarter and that the Company had suffered a net loss of $10 million in the quarter compared to net income of $13 million in the prior year period.  During the corresponding conference call, defendant Moss further revealed that the estimated range for potential loss was now $60 million at the low end and up to $185 million at the high end, reflecting the total potential remediation costs at impacted sites.

88.     On this news, the price of Shoals Class A common stock fell from $16.23 per share on November 7, 2023 to $12.95 per share on November 9, 2023, or approximately 20%, over a two-day trading period, on above-average trading volume.  However, the price of Shoals Class A common stock continued to be artificially inflated as defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

89.     The 3Q23 Release stated that Shoals' quarterly revenue had increased 48% year-over-year to $134 million from $91 million.  The 3Q23 Release also quoted defendant Moss who

highlighted Shoals' "'record'" backlog and awarded orders and claimed that the Company's purportedly "'strong value proposition'" would continue to "'drive order growth,'" stating in pertinent part as follows:

> "Backlog and awarded orders increased 34% year-over-year and 16% sequentially to a Company record of $633.3 million as the Company added over $220 million in orders in the quarter. *While the domestic utility scale solar market is currently experiencing slower growth, we believe our strong value proposition and the emerging strength from our international business will continue to drive order growth*. We are pleased that international now represents more than 10% of our backlog and awarded orders."

90.　　On November 7, 2023, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2023, hosted by defendants Moss and Bardos. During the call, defendant Moss highlighted Shoals' purportedly "industry-leading margins" and "significant cash flow generation," and represented that he could "not be more excited" and "optimistic" about what could be achieved in the coming quarters.

91.　　During the Q&A portion of the call, an analyst from Morgan Stanley inquired directly whether any customer projects had been "tripped offline" as a result of the shrinkback issues. In response, defendant Moss assured investors that Shoals had not observed any impacts and that customers were "appreciative" of Shoals handling of the issue, stating in pertinent part as follows:

> *Just to add to that, as Meghan said, we're proactively reaching out to our customers. We have not seen any project movement specific to the warranty issue. I think the customers understand that this is a supplier issue*. And as Meghan said, taking care of them is our top priority. So I think everybody is appreciative of how we're communicating and working in the marketplace around this issue.

92.　　That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2023 ("3Q23 Form 10-Q"), which was signed by defendants Moss and Bardos. The 3Q23 Form 10-Q contained the same financial information that was reported in the 3Q23 Release.

93.     The statements referenced in ¶¶89-92 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a)     that several of Shoals' customers had expressed concerns regarding the Company's defective wiring given the attendant risks of serious injury or death, fires, property damage, and increased governmental scrutiny;

(b)     that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, or quality of its offerings had become materially impaired;

(c)     that, as a result of (a)-(b) above, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects; and

(d)     that Shoals' sale of defective wire harnesses had negatively impacted the Company's sales, customer relationships, and financial results and that defendants' representations regarding Shoals' business, sales, and prospects were materially misleading.

94.     As would be subsequently revealed, the installation of defective – and potentially dangerous – wire harnesses on so many of the Company's projects negatively impacted Shoals' customer relationships.  For example, a November 10, 2023 Roth MKM analyst report stated that the analysts' "checks" with Shoals' customers

> suggest that since receiving the safety notice from SHLS regarding shrinkback . . . , customers are likely scrambling to identify any instances of the issue.  ***Critical concerns we have heard include (1) Serious injury or death, (2) The exposed wiring may cause fire and property damage, and (3) PUCs may get involved with increased scrutiny***.

(Emphasis in original.)  According to the report, at least one affected site had already suffered property damage arising from a brush fire believed to have ignited as a result of contact with a defective, Shoals-installed wire harness.

95.     Then, on February 28, 2024, Shoals issued a press release disclosing the Company's financial results for its fourth fiscal quarter and year ended December 31, 2023 ("4Q23 Release"). The 4Q23 Release revealed that growth in Shoals' backlog and awarded orders had materially deteriorated, falling sequentially by $2 million to $631.3 million, down from $633.3 million in the prior quarter.  In addition, the 4Q23 Release issued disappointing financial guidance for Shoals' first fiscal quarter and full year 2024.  In particular, the 4Q23 Release issued quarterly revenue guidance of $90 million to $100 million, revealing that quarterly revenue was projected to decline sequentially by more than $35 million at the midpoint of the range.  In addition, the 4Q23 Release provided 2024 annual revenue guidance for the Company of $480 to $520 million, which at the midpoint was approximately 19% below consensus analyst estimates of approximately $620 million.

96.     On this news, the price of Shoals Class A common stock fell from $15.39 per share on February 28, 2024 to $12.83 per share on February 29, 2024, or more than 16%, on above-average trading volume of over 15 million shares traded.  However, the price of Shoals Class A common stock continued to be artificially inflated as defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.  For example, defendants' statements identified in ¶95 above materially understated and misrepresented the negative impact of the wire shrinkback issue on Shoals' business, financial results, and prospects.

97.     On May 7, 2024, Shoals issued a press release disclosing the Company's financial results for its first fiscal quarter ended March 31, 2024 ("1Q24 Release").  The 1Q24 Release

revealed that Shoals' business deterioration as a result of the fallout from the shrinkback remediation issue was much more severe than previously disclosed. Specifically, the 1Q24 Release revealed that Shoals' backlog and awarded orders had fallen more than $16 million on a sequential basis to $615.2 million. The 1Q24 Release also lowered the Company's 2024 annual revenue guidance by 7% at the midpoint to a range of $440 million to $490 million. During a related earnings call, Shoals executives revealed that the Company had suffered an "unprecedented" project cancellation and several order delays during the quarter.

98.     That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the first quarter of 2024 that stated that the Company's estimate of shrinkback remediation and warranty costs "may increase" and that such increase "may be material."

99.     On this news, the price of Shoals Class A common stock fell from $8.80 per share on May 7, 2024 to $7.51 per share on May 8, 2024, or approximately 15%, on above-average trading volume of over 13 million shares traded.

100.     In total, the price of Shoals' Class A common stock has fallen over 80% from the Class Period high, inflicting hundreds of millions of dollars in financial losses and economic damages under the federal securities laws on investors.

## ADDITIONAL SCIENTER ALLEGATIONS

101.     As alleged herein, the 1934 Act Defendants acted with scienter in that these defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. The 1934 Act Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The 1934 Act Defendants, by virtue of their receipt of information reflecting the true facts regarding Shoals, and their control over and/or

receipt and/or modification of Shoals' materially false and misleading statements, were active and culpable participants in the fraud alleged herein.

102. The 1934 Act Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the 1934 Act Individual Defendants.

103. The 1934 Act Individual Defendants, because of their positions with Shoals and during the time of their employment at Shoals, controlled the contents of Shoals' public statements. The 1934 Act Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the 1934 Act Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made by defendants during the Class Period and identified herein were materially false and misleading.

104. Notably, Shoals has admitted that beginning in 2020 (roughly a year before the start of the Class Period) the Company installed defective wires in approximately 30% of the harnesses it manufactured over a three-year period. The Company has also estimated that remediation costs could rise to $185 million – more than double the Company's revenue during the most recent fiscal quarter – and acknowledged that even this sum could be understated. The magnitude of the problem and its ubiquity in Shoals' wire harnesses, which impacted approximately 300 sites and a large proportion of Shoals' client base, during a multi-year period indicates that the issue was known to or

at the very least recklessly disregarded by the Company's most senior executives. Furthermore, the Company has stated in ancillary litigation that it received customers' complaints about the issue by at least March 2022, after which the Company has stated it took a variety of investigative and remedial actions that were not revealed to investors until the latter part of 2023. These actions could not have reasonably been taken without the involvement, or at the very least knowledge or reckless disregard, of the 1934 Act Individual Defendants.

105. The 1934 Act Defendants and other Company insiders to whom they were beholden also had the motive and opportunity to commit fraud. While the price of Shoals Class A common stock was artificially inflated, defendants conducted the IPO in January 2021 and two registered secondary public offerings in December 2022 (referred to herein as the SPO) and in March 2023. In the IPO, Shoals and one of the Company's private equity owners, an affiliate of Oaktree Capital Management, L.P., collectively sold more than 88.5 million shares of Shoals Class A common stock at $25 per share for over $2.2 billion in gross offering proceeds. In total, defendant Solon sold nearly ***$1.2 billion*** worth of Shoals Class A common stock at artificially inflated prices during the Class Period. In a subsequent stock offering, conducted in March 2023, defendant Solon sold an additional 24.5 million shares of Shoals Class A common stock at $24.70 per share for over $600 million in gross offering proceeds. In total, defendant Solon sold nearly $1.2 billion worth of Shoals Class A common stock during the Class Period. During the Class Period, defendant Whitaker likewise sold more than $14.4 million in Shoals stock at prices as high as $31 per share, and defendant Garton sold more than $4.8 million worth of Shoals stock. These sales were highly suspicious in both timing and amount. Notably, all of these sales occurred after the Company began installing harnesses with wires subject to excessive shrinkback, and the insider selling spree abruptly ended after the Company first disclosed the shrinkback issue to investors in May 2023.

106.     The exit of numerous Shoals' executives during the Class Period around the time that the Company was dealing with excessive shrinkback issues further bolsters an already compelling inference of scienter. For example, in November 2022, Shoals announced that defendant Whitaker would be stepping down as CEO in March 2023 – right before the Company first publicly disclosed the shrinkback issue even existed. Similarly, on April 8, 2022, Shoals announced that defendant Garton would be stepping down as CFO, an announcement that came soon after Shoals (belatedly) acknowledged it had received customer complaints regarding the shrinkback issue. Likewise, in February 2022 Shoals announced that its founder, defendant Solon, had resigned from the Company's Board, a resignation which occurred approximately two years after the Company had first begun installing defective wire harnesses but before this issue was disclosed to investors. In between those two events, defendant Solon sold nearly $1.2 billion worth of Shoals stock.

107.     The 1934 Act Defendants' scienter is further underscored by the mandated certifications of the 1934 Act Individual Defendants under the Sarbanes-Oxley Act of 2002, filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Shoals was made known to them and that the Company's disclosure-related controls were operating effectively.

**NO SAFE HARBOR**

108.     Shoals' "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenue and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

109.    The 1934 Act Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and approved by an executive officer of Shoals who knew that the FLS was false. None of the historic or present tense statements made by these defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by these defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE;
## FRAUD ON THE MARKET

110.    At all relevant times, the market for Shoals Class A common stock was an efficient market for the following reasons, among others:

(a)     Shoals Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     according to the Company's Form 10-K for the fiscal year ended December 31, 2023, Shoals had over 170 million shares of Class A common stock outstanding as of February 26, 2024;

(c)     as a regulated issuer, Shoals filed periodic public reports with the SEC;

(d)     Shoals regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about Shoals was rapidly reflected in and incorporated into prices for the Company's shares of Class A common stock during the Class Period.

111.    As a result of the foregoing, the market for Shoals Class A common stock promptly digested current information regarding Shoals from publicly available sources and reflected such information in the price of Shoals Class A common stock. Under these circumstances, all purchasers of Shoals Class A common stock during the Class Period suffered similar injury through their purchases of Shoals Class A common stock at artificially inflated prices, and a presumption of reliance applies.

112.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions. Because this action involves defendants' failure to disclose material adverse information regarding Shoals' business, operations, defective products, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

113.    During the Class Period, as detailed herein, the 1934 Act Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Shoals Class A common stock and operated as a fraud or deceit on Class Period purchasers of Shoals Class A common stock by misrepresenting the value of the Company's business and prospects in the Company's operations. As these defendants' misrepresentations and fraudulent conduct became apparent to the market and previously undisclosed material risks materialized, the price of the Company's stock fell precipitously on numerous occasions as the prior artificial inflation came out of the stock's price, as detailed herein.

As a result of their purchases of Shoals Class A common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

114. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Shoals Class A common stock during the Class Period (the "Class"), including shares purchased directly in the SPO. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

115. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Shoals Class A common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there could be hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Shoals or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

116. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

117. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

118. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the SPO Registration Statement was materially false and misleading;

(b) whether statements made by defendants during the Class Period misrepresented material facts about the business, financials, and operations of Shoals;

(c) whether the 1934 Act Defendants acted with scienter; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

119. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**For Violation of §11 of the 1933 Act**
**Against Shoals, the 1933 Act Individual Defendants Except Defendant Solon,**
**and the Underwriter Defendants**

120. Plaintiff incorporates ¶¶1-8, 13, 18-42, 67-69, and 114-119 by reference.

121. Plaintiff asserts this Count on behalf of itself and the Class against Shoals, the 1933 Act Individual Defendants except defendant Solon, and the Underwriter Defendants.

122. Section 11 of the 1933 Act does not require a showing of scienter or fraudulent intent, and Plaintiff disavows all averments of fraud for purposes of this Count.

123. The SPO Registration Statement was negligently prepared and as a result inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary

to make the statements made not misleading, and omitted to state material facts required to be stated therein including as required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) and Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105.

124. Specifically, the SPO Registration Statement failed to disclose the following material adverse facts which existed at the time of the SPO:

(a) that between 2020 and the end of 2022, Shoals had installed defective wires at approximately 300 sites impacting approximately 30% of all wire harnesses manufactured by the Company during this time period;

(b) that, as a result of (a) above, Shoals was facing tens of millions of dollars in shrinkback warranty liabilities;

(c) that Shoals had not booked a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue;

(d) that Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers;

(e) that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, and quality of its offerings had become materially impaired; and

(f) that, as a result of (a)-(e) above, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects.

125. Defendant Shoals is strictly liable to plaintiff and the Class for the misstatements and omissions contained in the SPO Registration Statement.

126.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SPO Registration Statement that are herein alleged to be materially false and misleading were true and without omissions of any material facts and were not misleading.

127.     By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

128.     Plaintiff purchased Shoals Class A common stock directly in the SPO as detailed herein.

129.     Plaintiff and the Class have sustained damages.  The value of the Shoals Class A common stock issued in the SPO has declined substantially subsequent to and due to defendants' violations.

130.     At the time of their purchases of Shoals Class A common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public.

**COUNT II**

**For Violation of §12(a)(2) of the 1933 Act**
**Against Shoals, the 1933 Act Individual Defendants,**
**and the Underwriter Defendants**

131.     Plaintiff incorporates ¶¶1-8, 13, 18-42, 67-69, and 114-130 by reference.

132. Plaintiff asserts this Count on behalf of itself and the Class against Shoals, the 1933 Act Individual Defendants, and the Underwriter Defendants (collectively, the "Solicitor-Seller Defendants").

133. Section 12(a)(2) of the 1933 Act does not require a showing of scienter or fraudulent intent, and plaintiff disavows all averments of fraud for purposes of this Count.

134. By means of the defective SPO Prospectus and other conduct alleged herein, the Solicitor-Seller Defendants promoted and sold the Shoals Class A common stock sold in the SPO to plaintiff and other members of the Class.

135. The SPO Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. The defendants named herein owed plaintiff and the other members of the Class who purchased Shoals Class A common stock pursuant to the SPO Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the SPO Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the SPO Prospectus as set forth above.

136. Plaintiff did not know, nor in the exercise of reasonable diligence could plaintiff have known, of the untruths and omissions contained in the SPO Prospectus at the time plaintiff acquired Shoals Class A common stock.

137. By reason of the conduct alleged herein, the Solicitor-Seller Defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Shoals Class A common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, plaintiff

and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

## COUNT III

### For Violation of §15 of the 1933 Act
### Against Shoals and the 1933 Act Individual Defendants

138.    Plaintiff incorporates ¶¶1-8, 13, 18-42, 67-69, and 114-137 by reference.

139.    Plaintiff asserts this Count on behalf of itself and the Class against Shoals and the 1933 Act Individual Defendants.

140.    The 1933 Act Individual Defendants acted as controlling persons of Shoals within the meaning of §15 of the 1933 Act. By reason of their positions with the Company, agreements and course of dealings with the Company, and/or their ownership of Shoals stock, the 1933 Act Individual Defendants had the power and authority to cause Shoals to engage in the wrongful conduct complained of herein and were culpable participants in the violations of law described herein. Shoals controlled the 1933 Act Individual Defendants who were the Company's employees at the time of the SPO. By reason of such conduct, defendants are liable pursuant to §15 of the 1933 Act.

## COUNT IV

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against Shoals and the 1934 Act Individual Defendants

141.    Plaintiff incorporates ¶¶1-119 by reference.

142.    Plaintiff asserts this Count on behalf of itself and the Class against Shoals and the 1934 Act Individual Defendants.

143. During the Class Period, the defendants named herein disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144. The defendants named herein violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a)    employed devices, schemes, and artifices to defraud;

        (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Shoals Class A common stock during the Class Period.

145. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Shoals common stock. Plaintiff and the Class would not have purchased Shoals Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT V

**For Violation of §20(a) of the 1934 Act**
**Against Shoals, the 1934 Act Individual Defendants,**
**and Defendant Solon**

146. Plaintiff incorporates ¶¶1-119 and 141-145 by reference.

147. Plaintiff asserts this Count on behalf of itself and the Class against Shoals, the 1934 Act Individual Defendants, and defendant Solon.

148. The 1934 Act Individual Defendants and defendant Solon acted as controlling persons of Shoals within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, agreements and course of dealings with the Company, and/or their ownership of Shoals stock, the 1934 Act Individual Defendants and defendant Solon had the power and authority to cause Shoals to engage in the wrongful conduct complained of herein and were culpable participants in the violations of law described herein. Shoals controlled the 1934 Act Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 13, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977


s/ Christopher M. Wood
CHRISTOPHER M. WOOD

200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
FRANCISCO J. MEJIA
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com
fmejia@rgrdlaw.com

CHRISTIANSEN & DEHNER, P.A.
SCOTT R. CHRISTIANSEN
63 Sarasota Center Blvd., Suite 107
Sarasota, FL 34240
Telephone: 941/377-2200
941/377-4848 (fax)
scott@cdpension.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Kissimmee Utility Authority Employees' Retirement Plan ("Plaintiff") declares:

      1.      Plaintiff has reviewed a complaint and authorized its filing.

      2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

      3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

      4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

      5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Ryan v. FIGS, Inc.,* No. 2:22-cv-07939 (C.D. Cal.)

      6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

      I declare under penalty of perjury that the foregoing is true and correct. Executed this <u>10th</u> day of May, 2024.

Kissimmee Utility Authority Employees'
Retirement Plan

By: *Larry Mattern*
         879C1416B26E405...
Its:  Larry Mattern, Chairman

By: _____
Its:  Barbara Gonzales, Secretary

SHOALS

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Kissimmee Utility Authority Employees' Retirement Plan ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Ryan v. FIGS, Inc.,* No. 2:22-cv-07939 (C.D. Cal.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ____13____ day of May, 2024.

Kissimmee Utility Authority Employees'
Retirement Plan

By:     _____
Its:    Larry Mattern, Chairman

By:     *Barbara Gonzales*_____
Its:    Barbara Gonzales, Secretary

SHOALS

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 01/27/2021 | 406 | $25.00 |
| 03/04/2021 | 360 | $32.47 |
| 03/18/2021 | 100 | $32.76 |
| 03/18/2021 | 580 | $30.63 |
| 03/25/2021 | 250 | $28.85 |
| 03/30/2021 | 80 | $30.44 |
| 03/30/2021 | 90 | $30.48 |
| 04/15/2021 | 200 | $32.47 |
| 04/19/2021 | 20 | $30.96 |
| 04/19/2021 | 150 | $31.78 |
| 04/20/2021 | 10 | $31.00 |
| 05/03/2021 | 120 | $30.97 |
| 05/03/2021 | 270 | $30.77 |
| 05/07/2021 | 150 | $30.39 |
| 05/20/2021 | 50 | $23.41 |
| 05/20/2021 | 290 | $23.30 |
| 07/14/2021 | 150 | $28.95 |
| 07/15/2021 | 430 | $27.48 |
| 07/16/2021 | 270 | $27.78 |
| 07/19/2021 | 160 | $25.38 |
| 08/16/2021 | 160 | $29.83 |
| 08/17/2021 | 30 | $28.69 |
| 08/17/2021 | 190 | $28.83 |
| 09/10/2021 | 280 | $29.96 |
| 09/28/2021 | 230 | $28.89 |
| 10/01/2021 | 10 | $27.24 |
| 10/01/2021 | 10 | $27.28 |
| 10/01/2021 | 60 | $27.25 |
| 10/04/2021 | 210 | $27.24 |
| 12/09/2021 | 2,590 | $28.51 |
| 01/27/2022 | 32 | $13.47 |
| 10/12/2022 | 550 | $20.65 |
| 10/13/2022 | 370 | $20.28 |
| 10/14/2022 | 440 | $20.18 |
| 10/19/2022 | 330 | $20.43 |
| 10/20/2022 | 260 | $19.82 |
| 10/21/2022 | 30 | $19.50 |
| 11/07/2022 | 210 | $18.95 |
| 11/15/2022 | 170 | $26.66 |
| 11/15/2022 | 580 | $28.04 |
| 12/01/2022 | 360 | $24.03 |
| 12/02/2022 | 310 | $23.80 |
| 12/02/2022 | 1,500 | $22.25 |
| 12/06/2022 | 220 | $23.73 |
| 01/25/2023 | 460 | $27.69 |

DocuSign Envelope ID: EEE10E98-5790-4DE1-A84F-2B105C4C3CCF

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 01/26/2023 | 230 | $26.51 |
| 02/09/2023 | 260 | $25.31 |
| 02/22/2023 | 350 | $24.13 |
| 03/08/2023 | 950 | $24.35 |
| 03/09/2023 | 70 | $24.12 |
| 03/09/2023 | 250 | $24.14 |
| 03/09/2023 | 430 | $23.19 |
| 03/10/2023 | 260 | $21.92 |
| 03/13/2023 | 400 | $20.82 |
| 03/13/2023 | 530 | $20.98 |
| 03/14/2023 | 600 | $21.39 |
| 03/15/2023 | 180 | $19.53 |
| 03/15/2023 | 200 | $19.51 |
| 03/15/2023 | 450 | $20.50 |
| 03/17/2023 | 340 | $20.07 |
| 03/21/2023 | 490 | $21.85 |
| 04/05/2023 | 550 | $21.82 |
| 04/26/2023 | 541 | $20.67 |
| 04/26/2023 | 650 | $20.19 |
| 07/06/2023 | 779 | $22.78 |
| 08/07/2023 | 414 | $22.42 |
| 08/08/2023 | 409 | $21.81 |
| 08/09/2023 | 563 | $21.87 |
| 08/15/2023 | 450 | $20.64 |
| 08/22/2023 | 259 | $19.03 |
| 12/18/2023 | 2,739 | $15.80 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 11/10/2021 | 310 | $28.79 |
| 01/04/2022 | 670 | $22.37 |
| 01/19/2022 | 770 | $17.92 |
| 01/21/2022 | 570 | $15.84 |
| 01/24/2022 | 790 | $16.20 |
| 01/25/2022 | 20 | $14.96 |
| 01/25/2022 | 20 | $15.01 |
| 01/25/2022 | 890 | $15.00 |
| 03/08/2022 | 1,300 | $15.78 |
| 03/23/2022 | 370 | $22.45 |
| 03/25/2022 | 920 | $19.91 |
| 03/28/2022 | 1,308 | $18.89 |
| 10/30/2023 | 702 | $15.04 |
| 11/01/2023 | 762 | $14.52 |
| 11/02/2023 | 705 | $15.24 |
| 11/02/2023 | 1,672 | $15.11 |
| 11/03/2023 | 84 | $16.25 |
| 11/03/2023 | 619 | $16.01 |
| 11/07/2023 | 466 | $16.11 |
| 11/08/2023 | 815 | $14.60 |
| 11/09/2023 | 2,935 | $13.12 |
| 11/13/2023 | 1,104 | $13.64 |

| Date<br>Disposed | Amount of<br>Shares Disposed | Price |
|---|---|---|
| 11/14/2023 | 759 | $14.98 |
| 11/21/2023 | 751 | $14.34 |
| 11/27/2023 | 513 | $13.68 |
| 11/28/2023 | 755 | $13.84 |
| 01/16/2024 | 1,311 | $13.09 |
| 01/17/2024 | 996 | $13.13 |
| 02/21/2024 | 570 | $15.14 |
| 02/22/2024 | 901 | $14.73 |
| 02/23/2024 | 1,295 | $14.54 |
| 02/28/2024 | 709 | $15.72 |
| 03/04/2024 | 710 | $12.94 |

Prices listed are rounded to two decimal places.